NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

BLANCHE LANCASTER, PETITIONER, v. MUTUAL CHEMI-
CAL COMPANY OF AMERICA, RESPONDENT.

Decided December 7, 1937.

For the petitioner, *Louis Hoberman*.

For the respondent, *George T. Vickers*.

A petition for compensation having been filed in this court
on November 28th, 1936, alleging that Elmer Lancaster,
deceased husband of the petitioner, Blanche Lancaster, met
his death on November 4th, 1936, as a result of chrome
poisoning suffered in the course of his employment and arising
therefrom while working in respondent's potassium bichro-
mate plant.

In answer the respondent admits the employment of the
deceased Elmer Lancaster from about September 10th, 1926,
to about August 28th, 1936; that in the course of his employ-
ment as a laborer he was exposed to chrome, but the respond-
ent denies that the petitioner suffered any accident or com-
pensable disease.

\*       \*       \*       \*       \*       \*       \*

The petitioner testified that she was the widow of the
deceased Elmer Lancaster; that she and the deceased lived
together as husband and wife; that her deceased husband was

employed in respondent's chemical plant at Jersey City over a period of not quite ten years; that throughout the ten years of his employment with the respondent, the deceased worked steadily on all working days except in the summer of 1936 when work was slack he took off Thursdays and remained at home, resting mostly in bed; that in the spring of 1936 he complained of aches and pains in the chest, he coughed, lost appetite and lost thirty or forty pounds of weight; that he was intermittently treated by their family physician, Dr. Peter F. Ghee, of Jersey City, and that her husband last worked for the respondent on August 28th, 1936, that he took to his bed and was, on or about October 1st, 1936, removed to the Medical Center of Jersey City where he remained until his death on November 4th following. This witness also produced a death certificate obtained from the board of health and vital statistics which was offered in evidence and showed that the cause of death to Elmer Lancaster given as carcinoma of the bronchus, pulmonary edema secondary. This death certificate was also identified by Dr. William H. Longley, Jr., who attended the deceased at the Medical Center and signed the death certificate.

Dr. Peter F. Ghee called as a witness for the petitioner testified that he was a licensed and practicing physician in the State of New Jersey, having practiced for about thirty-nine years; that in the spring of 1936, Elmer Lancaster came to him at his office occasionally and that he treated him for bronchial trouble and advised him to stop his work and that he thought that whatever the conditions under which he was working were against him; that he prescribed medicine with the idea of soothing his bronchial tubes and to lessen the irritation; that Lancaster was coughing, that it was a rather hacky and troublesome cough more or less with a certain amount of mucous spitting up. This witness further testified that from August 28th, 1936, on, Elmer Lancaster was unable to report back to work; that he was a very sick man and that the witness treated him from then on until October 1st, when Lancaster went to the hospital, and that the witness determined that Lancaster was suffering with bronchitis and

with a pronounced cough and sputum and fever; that subjectively the patient complained of pain in his chest, and that while this witness saw Lancaster at the Medical Center, he did not visit him professionally and that he did not really know the cause of death but that he died from some bronchial trouble evidently. Asked on cross-examination whether he could tell what irritant, in his opinion, contributed or was the cause of the illness for which he treated Lancaster, the doctor said he would not go so far as that, but that he was convinced it was some strong irritant or irritating cause that he was breathing in or taking in through the air, because of the rapidity with which the cough increased, and that, in his opinion, a carcinoma of the lung would not cause the peculiar cough Lancaster had. This witness testified that at no time during his treatment of Lancaster did either Lancaster or he refer to chrome, and that he, the doctor, was never able to determine what irritant caused the irritation of the bronchial tubes, and that he knew nothing about the chemical composition of chrome, and in the opinion of this witness no one knows the cause of carcinoma.

On behalf of the petitioner, Dr. Clarence F. Winchell was called and qualified as a chemist and toxicologist. His testimony was apparently scientific, instructive and would have much probative force on the question of the effect of potassium bichromate on the respiratory organs of the human body if the evidence that potassium bichromate in the instant case in fact had been carried in the air current into the farther recesses of the lungs, namely the bronchus, the bronchioli or down into the alveolar tract.

Dr. Otto Lowry called as a witness for the petitioner testified among other things that chrome is an irritating substance and when it comes in contact with the body and tissues in solution compounds with some of the organic material in the body and acts as an irritant and in sufficient concentration causes ulcers which may be on the skin or on the mucous membrane of the nose or may appear on the mucous membrane of the throat and may produce bronchiectasis in the lungs. The doctor further testified to his belief that inhala-

tion of chrome may have aggravated or activated the existing carcinoma, although he, himself, had never seen any carcinoma that had been produced by chrome.

Dr. Eugene L. Spohn called as a witness on behalf of the petitioner testified he is at present on the cancer service and gynecologic service at the Medical Center in Jersey City as house surgeon on both services; he further testified that he had never examined a patient suffering from chrome poisoning. In answer to the hypothetical question involving sickness and cause of death, the doctor said "there may be a relation between a man employed under the conditions that I have heard and the cause of death," and the witness further testified that the cause of carcinoma is unknown but it is agreed that "any chemical irritation, any thermal irritation, any mechanical irritation, any bacterial irritation over a continued period of time may aggravate, and by some authorities may even be a cause of the beginning of some types of malignant tumors." The doctor frankly admitted that in his own experience, he knew of no case where there had been chrome ulcers in the lungs.

Dr. George White was called as a witness on behalf of the petitioner and testified in part that he knew the deceased; that the respondent manufactured bichromate of soda and oxalic acid, that he treated the deceased at the plant dispensary for acute bronchitis and an erosion of the mucous membrane of the septum of the nose. This witness was recalled on rebuttal in the petitioner's case and gave further testimony regarding the dispensary records and that the nasal septum perforation was complete and healed in 1932 and so far as that disease was concerned, there was no further exposure thereto during the continuance of the employment of the deceased by the respondent.

Dr. Benjamin J. Macchi was called on as a witness on behalf of the petitioner. The doctor testified that he had occasion to examine about fifteen to twenty patients suffering from bichromate poisoning; that among these patients there were different perforated septums, evidences of chronic bronchitis and that in that series there were four deaths;

three died of cancer of the lung and the fourth the patient had a chronic nephritis. The witness further testified, to his belief, there was a causal relationship between the chronic irritation produced by chrome and the deaths from cancer of the lungs. Again referring to the three deaths from cancer of the lung to which the witness had testified, he expressed the belief that "reaction was due to chronic irritation of the mucous membranes of the entire respiratory tract or bronchial tract" and this witness further testified "we do know definitely and experimentally that chronic irritation can cause cancers and we do know that chrome is an irritant, so, therefore, we can definitely say that cancers of the lungs were due to the chronic irritation produced by chrome;" and the witness further expressed the opinion in answer to the hypothetical question that "potassium bichromate was a sufficient irritant to cause the death of Elmer Lancaster." On further examination the witness also testified that he did no know the cause of cancer and that so far as the literature of his profession known to him, nobody else knows the cause of cancer.

In the cases referred to by this witness there was neither a bronchoscopy, a biopsy nor a post mortem to determine the cause of death. The opinion of this witness seems to be based on the existence of coughs indicating previous bronchitis, on X-rays showing or indicating tumors of the lungs and an assumption that because the patients worked in a chrome factory, and chrome is an irritant, therefore the patients had cancers of the lungs due to chrome poisoning.

The claim of the petitioner must rest on proof that her husband in the course of and arising out of his employment with the respondent incurred an occupational disease, called chrome poisoning, resulting in a carcinoma of the left lung from which he died. It is contended by the petitioner that inhalation of minute particles of chrome in the form of dust in the air and breathed into the lungs are, because of their chemical properties, a destructive irritant producing lung cancer from which he died. From the testimony produced on behalf of the petitioner in this case, it is apparent that the

cause of cancer is unknown to the medical profession and that the malignancy of a tumorous growth can only be determined scientifically through what is known as a biopsy of portions of the growth secured therefrom, by means of a bronchoscopy while the patient is alive, or upon a post mortem.

On behalf of the respondent the following witnesses were called: Dr. George D. White, Dr. Albert S. Edel, chemist and toxicologist, Dr. William H. Longley, Jr., Dr. Berthold S. Pollock, Dr. Mervin Barrone (bronchoscopist), Dr. Joseph Koppel and Mr. Herbert M. Kaufman. Dr. White testified as a physician and a chemist. From the testimony of this witness, it appears that the chrome manufactured by this respondent is bichromate of soda and that it is an oxidizing agent and in its manufactured condition before coming into contact with moisture and organic matter is the sesqui oxide; and that in contact with moisture and organic matter oxidation takes place in which an excess atom of oxygen is given up reducing the higher to a lower oxide known as valance 3 which is inert. In this process of oxidation the organic matter joins up with the excess oxygen and is burned. That this sesqui oxide is characterized by deliquescence, in the language of the witness "it wants to grab water." This witness further testified that air is never perfectly dry and always has enough moisture to make these small crystals of bichromate sticky and that as soon as they become sticky they become adherent to the mucous membranes and that they contain mucine and other organic matter where this transformation from the higher to the inert oxide would take place and that because of the cilia of the epithelium of the nose and the natural curvature of the posterior nares, such crystals breathed in would be deviated from side to side and the carbon of the organic matter being "grabbed" by the anhydrous crystals, the oxidation formerly described by the witness takes place reducing the crystals to an inert lower form.

This witness gave as his opinion both as a physician and as a chemist that he knew of no authority for the conclusion that bichromate could produce a carcinoma or a malignant growth in the lung, and that if any such authority existed it would solve the problem of cancer.

Dr. Albert S. Edel called as a witness for the respondent was qualified as a chemist and toxicologist and testified that he had experience with chrome cases where it was alleged that persons died of chrome poisoning, that he had examined after post mortems the vital organs such as liver, kidney, spleen, &c., and had never found chrome present. This witness also testified that while bichromate of soda was toxic if taken internally in sufficient quantity, it was not industrially toxic.

Dr. William H. Longley, Jr., a witness previously called on behalf of the petitioner was called to testify on behalf of the respondent. He testified that he was a resident physician at the Medical Center when Elmer Lancaster was in that institution during his last illness and that he was the physician who certified to the cause of death as evidenced by the death certificate previously referred to. This witness also testified that for the scientific determination of the malignancy of a tumor a microscopic examination of a detached portion of the growth would be necessary, and that in the instant case although a bronchoscopy was performed no portions of the tumor located below or near the corina were secured and that there was no post mortem.

Dr. Berthold S. Pollock sworn on behalf of the respondent being a medical practitioner of many years experience and having specialized in lung diseases and the entire respiratory tract in relation thereto produced an illustration drawn to scale showing the entire respiratory organs from the posterior nares through the epiglottis, the traches, the bronchi, to their final determination in the alveoli. This illustration showed these organs as though opened for inspection of the interior and depicted graphically the bifurcation of the trachea into the bronchi on which illustration location of the tumorous growth in the left lung of the deceased could be located with relation to the corina. This witness further testified that assuming the bronchoscopies performed on this deceased showed no pathology above the corina, or as being clear down to the corina at the bifurcation of the trachea, that there was no evidence of a causal relation between the carcinoma, if one

in fact existed, and the employment of Lancaster as a chrome worker.

Dr. Joseph Koppel, a witness sworn and called on behalf of the respondent likewise using the illustrated chart produced by Dr. Pollack gave as his opinion that the absence of any pathology in the respiratory tract as far as the corina justified the conclusion that the lung condition of the deceased had no relation to chrome inhalation.

Dr. Mervin Barrone sworn and called as a witness on behalf of the respondent was qualified as a medical practitioner connected with the Medical Center in Jersey City and so far as the present case is concerned, acting as an expert on bronchoscopy and that on two occasions in the month of October, 1936, he performed a bronschoscopy on each occasion for the purpose of diagnosing the ailment of Elmer Lancaster; that on neither occasion was he able to secure any of the tissue of the tumorous growth which he saw in the left lung of the patient below or on the level with the corina; that on these occasions there was no pathology above the corina and that his examination would have disclosed any chrome ulcers or irritation had they existed.

Mr. Herbert M. Kaufman being sworn as a witness on behalf of the respondent testified that he was a chemical engineer and the plant manager at the Jersey City plant of the respondent; that among other things the respondent manufactured bichromate of soda and had not manufactured bichromate of potassium at any time during four or five years last past; he explained the character of the work done by Elmer Lancaster.

In rebuttal the petitioner recalled Dr. George D. White and examined him regarding plant dispensary records and treatments of Elmer Lancaster while in the employ of the respondent, and it was during this testimony that the evidence respecting a nasal septum perforation was brought out. Giving to the testimony of the petitioner and her witnesses both on the main case and in rebuttal and to petitioner's exhibits their broadest scope and effect, that evidence is so preponderatingly outweighed by the evidence produced by the

respondent that it is impossible to conclude that the carcinoma of the bronchus and subsequently pulmonary edema was either produced or exacerbated from contact with or inhalation of chrome or that there was any causal relation between the employment of the deceased in the plant of the respondent and his death. On the contrary, I am convinced and so find from the preponderance of the evidence that assuming Elmer Lancaster to have died of a carcinoma of the bronchus in the left lung according to the clinical diagnosis of his disease, there is no evidence of the cause or origin of the disease from which he suffered, nor that Elmer Lancaster contracted chrome poisoning in the course of his employment with respondent resulting in the death of Elmer Lancaster as alleged in the petition and sought to be established by the evidence.

After carefully considering all of the testimony and other evidence admitted in the case, I have come to the conclusion that petitioner has failed in her burden of proving that her husband, Elmer Lancaster, came to his death from either an accident or a compensable disease arising out of or in the course of his employment.

\*        \*        \*        \*        \*        \*        \*

JOHN C. WEGNER,
*Referee.*